UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

Plaintiff,

v. Case No. 18-20075

D-1 Adam Dean Brown, Sean F. Cox
United States District Court Judge

Defendant.
_______________________________/

**OPINION AND ORDER REGARDING MOTIONS IN LIMINE (ECF Nos. 80, 81, 82, 84, 85, and 103)**

A grand jury indicted Defendant Adam Dean Brown on five drug charges: (1) conspiracy to distribute and to possess with intent to distribute a controlled substance (death resulting) (Count I); (2) possession with intent to distribute a controlled substance (Count III); (3) possession with intent to distribute a controlled substance (Count IV); (4) distribution of a controlled substance (death resulting) (Count V); (5) distribution of a controlled substance (serious bodily injury resulting) (Count VI) (ECF No. 20).

The indictment included charges against Brown's alleged co-conspirators, James "Stoney" Sharp and Terence Robinson. Sharp and Robinson pleaded guilty pursuant to Rule 11 plea agreements. Brown is the only defendant going to trial, which is set to begin on August 20, 2019.

To prepare for trial, Brown and the Government filed a total of six motions *in limine*. Brown filed four motions: (1) a motion for the disclosure of Robinson's Pre-Sentence Investigation Report ("PSR") and to unseal the transcript from Robinson's plea hearing; (2) a motion to exclude the testimony of the Government's proposed laboratory expert or, in the alternative, for a *Daubert*

hearing; and (3) a motion for a *Daubert* hearing and to exclude the testimony of the Government's proposed expert cellular analysis; and (4) a motion to exclude evidence regarding a drug sale that Sharp made on October 5, 2016. The Government has filed two motions: (1) a motion concerning the admissibility of photographs at trial; and (2) a motion concerning the admissibility of certain out-of-court statements.

Each side has responded to the other side's motions. Only one reply was filed (by the Government, in support of their motion for the admissibility of the out-of-court statements). The Court heard oral arguments on the six motions *in limine* on July 16, 2019.

For the reasons below, the Court will dispose of these motions as follows:

<u>Defendant Brown's Motions</u>

- ECF No. 80 (Robinson's PSR and Plea Transcript): **DENIED** as to Robinson's PSR and **GRANTED** as to the plea transcript.
- ECF No. 81 (Challenge to Lab Report): **DENIED WITHOUT PREJUDICE**
- ECF No. 82 (Challenge to Cell-site Analysis): **DENIED WITHOUT PREJUDICE**
- ECF No. 103 (Evidence of Sharp's October 2016 drug deal): **DENIED**

<u>The Government's Motions</u>

- ECF No. 84 (Photographs of A.B.): **DENIED WITHOUT PREJUDICE**
- ECF No. 85 (A.B's out-of-court statements): **GRANTED** as to Statements One, Two, Three, and Four and **DENIED** as to Statements Five and Six

## BACKGROUND[1]

The Government believes that Brown was a drug dealer. The Government contends that, on

[1] This factual background was taken from the Government's Trial Brief. (ECF No. 89).

May 27, 2017 and June 15, 2017, Brown was found in possession of large quantities of heroin and cash. The Government also contends that Brown's heroin contained fentanyl and endangered the lives of his customers. Specifically, the Government alleges that, on October 16, 2017, Brown sold a mix of heroin and fentanyl to "A.B.," who overdosed and died after taking the drugs. The Government also alleges that, on January 22, 2018, Brown sold a mix of heroin and fentanyl to "J.K.," who overdosed on the drugs and sustained serious bodily injury. A.B's death and J.K.'s overdose are the basis for the "death resulting" and "serious bodily injury" penalty enhancements.

## ANALYSIS

### I. Motions in Limine Generally

Trials are dynamic, and a district court should grant a motion to *in limine* "only when that evidence is clearly inadmissible on all potential grounds." *Palmer v. Allen*, 2017 WL 218077 at*1 (E.D. Mich. Jan. 19, 2017) (quoting *Ind. Ins. Co. v. GE*, 326 F. Supp.2d, 844, 846 (N.D. Ohio 2004)). In cases where that high standard is not met, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in a proper context." *Id*. Denial of a motion to exclude evidence *in limine* does not necessarily mean that the Court will admit the evidence at trial. *See Luce v. United States*, 469 U.S. 38, 41 (1984). "[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Id*. at 41-42.

## BROWN'S MOTIONS

### II. ECF No. 80: Brown's Motion for Disclosure of Robinson's PSR and Sealed Plea Transcript

In this motion, Brown asks the Court to unseal his co-conspirator Robinson's plea transcript

and to order the Government to disclose Robinson's PSR to defense counsel or, alternatively, to this Court for an *in camera* inspection. Brown argues that these materials fall within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), the Jencks Act, 18 U.S.C. § 3500 *et seq*., or Fed. R. Crim. P. 16.

In response, the Government represents that it has already produced Robinson's Rule 11 plea agreement, Robinson's cooperation agreement, Robinson's grand jury testimony, all investigative interview reports pertaining to Robinson, and the substance of Robinson's criminal history. The Government argues that Robinson's PSR is not discoverable as exculpatory under *Brady* or the Jencks Act, and that it is not discoverable under Rule 16. The Government also argues that Robinson's guilty plea hearing transcript is not *Brady* or *Giglio* material and is "subsumed" into the materials it has already provided to Brown.

**A. The PSR**

"PSRs are confidential reports created by an arm of the court and designed for use by a judge in reaching a fair sentence." *United States v. Pendleton*, 832 F.3d 934, 940 (8th Cir. 2016). They "occupy a unique position," *In re Morning Song Bird Food Litig.*, 831 F.3d 765, 773 (6th Cir. 2016), and "ha[ve] always been jealously guarded by the drafters of the federal rules and by the federal courts." *United States v. Trevino*, 89 F.3d 187, 192 (4th Cir. 1996). "The commonly invoked reasons underlying PSRs' special status are threefold: (1) the defendant's interest in privacy and in preventing the dissemination of inaccurate information, (2) law enforcement's and cooperating informants' interest in confidentiality, and (3) the sentencing court's interest in encouraging the free flow of information during the presentencing process." *In re Morning Song*, 831 F.3d at 773.

"Neither *Brady* nor the Federal Rules of Criminal Procedure mandate that a trial court

produce a copy of a presentence report concerning a government witness, prepared for the court, to the defense upon request." *United States v. Sherlin*, 67 F.3d 1208, 1218 (6th Cir. 1995) (emphasis added). Additionally, "presentence reports are not statement of the defendant within the meaning of Jencks," but are "reports prepared by probation officers used primarily as an aid to district courts at sentencing" and contain "the government's version of the offense," to which defendants rarely object. *United States v. McGee*, 408 F.3d 966, 973 (7th Cir. 2005).

"Before a court determines that a PSR—or a portion of it—should be disclosed to a defendant, it should first conduct an *in camera* review <u>if</u> the defendant has clearly specified the information in the report that [defendant] expects will reveal exculpatory or impeachment evidence." *United States v. Trumbo*, 2019 WL 652303 at *2 (E.D.Mich. February 15, 2019) (citing *United States v. Allen*, 716 F.3d 98, 104 (4th Cir. 2013) (internal citations omitted) (emphasis in original). "A defendant must plainly articulate how the information contained in the PSR will be both material and favorable to his defense." *Id.*; *see also United States v. Trevino*, 89 F.3d 187, 192 (4th Cir. 1996) ("a district court is under no duty to conduct an in camera review of a requested PSR unless the accused has first clearly specified the information contained in the report that he expects will reveal exculpatory or impeachment evidence"). To meet this standard, Brown must make a "threshold showing of a good faith belief that a particular PSR contains exculpatory evidence not available elsewhere." *Trumbo*, 2019 WL 652303 at *3 (collecting cases).

Here, Brown argues that Robinson's PSR should be disclosed because:

> Defendants routinely make statements regarding the offense that are included in the PS[R] and cover matters that the defendant will testify to at trial. The PS[R] also will contain statements about [Robinson's] substance abuse during the time of the alleged offense. Finally, the PS[R] contains a comprehensive criminal history (well-beyond any lien check offered up by the government). It is not uncommon for the probation department to uncover a criminal history or criminal activity of the defendant not

disclosed by the government.

(ECF No. 80, PageID 579-80).

Brown has not set forth a good faith belief that Robinson's PSR has any exculpatory or impeachment evidence. Instead, Brown appears to be requesting the PSR in an attempt to discover *if it contains* any exculpatory or impeachment evidence. This speculative intent is evident in his assertion that defendants "routinely" make statements regarding the offense, and that it is "not uncommon" for the probation department to uncover a more-detailed criminal history. Moreover, to the extent that Brown argues that the PSR contains information about Robinson's substance abuse and criminal history, there is no indication that this information is "not available elsewhere." *Trumbo*, 2019 WL 652303 at *3. Thus, Brown is not entitled to Robinson's PSR.

### B. Plea Transcript

"Transcripts, so long as they exist, are kept by the clerk of the court." *United States v. Conteh*, 234 Fed.App'x 374, 389 (6th Cir. 2007). The Court has considered the parties' arguments and will order the Clerk of the Court to provide Brown with a copy of the transcript from Robinson's plea hearing.

### C. Conclusion

As described above, the Court will grant this motion in part and deny it in part.

## II. ECF No. 81: Brown's Motion to Exclude Testimony of Government's Proposed Laboratory Expert Or, in the Alternative, for a *Daubert* Hearing

In this motion, Brown moves to exclude some testimony from Melissa Earles, the Government's forensic scientist, arguing that it does not meet the requirements of Fed. R. Evid. 702 or 403. Earles tested white powder that was found at the scene of A.B.'s death and determined that

it was fentanyl. In her report, she also stated that "cocaine was detected but not confirmed due to poor concentration." Brown seeks to exclude this observation about cocaine.

In response, the Government argues that "there are no novel issues at play here." Earles, a ten-year veteran of the Michigan State Police's Northville Forensic Lab, performed "microscopic, chemical and/or instrumental analyses" on the white powder and reported her results. "That [Brown] is unhappy with the results is irrelevant, because Earle[s] is qualified and her methodology sound." Gov't's Res. 5 (ECF No. 93, PageID 751).

**A. The Admissibility of Expert Opinions**

"District court judges must determine whether an expert's testimony is both relevant and reliable when ruling on its admission." *Clay v. Ford Motor Company*, 215 F.3d 663, 667 (6th Cir. 2000). A trial judge's determinations regarding the admissibility of expert testimony are guided by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

Rule 702 of the Federal Rules of Evidence governs testimony by experts and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert,* the trial court acts as a "gatekeeper" that ensures that any and all scientific

testimony or evidence admitted is not only relevant, but reliable. *Daubert* sets forth a nonexclusive list of factors relevant to this inquiry: (1) whether the theory or technique can be or has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the theory or technique enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S at 593-94. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court confirmed that "the general gatekeeping obligation set forth in *Dauber*t" "applies when considering all expert testimony, including testimony based on technical and other specialized knowledge." *Clay v. Ford Motor Co.*, 215 F.3d at 667. "It further held that the specific *Daubert* factors—testing, peer review and publication, potential rate of error, and general acceptance in the relevant community—may be considered by the district court even when the proffered expert testimony is not scientific." *Id*. Whether these specific factors are reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. *Id.*

"It is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert,* 509 U.S. at 592 n.10). A district court is not obligated to hold a formal *Dauber*t hearing. *See Clay*, 215 F.3d at 667; *Nelson*, 243 F.3d at 249.

Here, the parties only dispute the relevance and reliability of Earles' analysis as it relates to cocaine.

**i. Relevance**

Earles' analysis and conclusion are undoubtedly relevant. The Government contends that Brown sold a drug mix containing fentanyl to A.B., who then overdosed and died after he injected the mix. What made up the drug mix that Brown allegedly sold, and that A.B. allegedly injected,

is a material fact of this case. Surely, Earles' results, including her observation about cocaine, provide insight on the composition of the white powder found near A.B. and would help the jury "understand the evidence" and "determine a fact in issue." Fed. R. Evid. 702(a). Thus, Earles' observation regarding the possible presence of cocaine is relevant.

**ii. Reliability**

As the Government observed, Earles's expertise is not novel. The Sixth Circuit has recognized that forensic scientists "are frequently considered qualified to testify at trial." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 528 (6th Cir. 2012) (collecting cases). And, Brown does not argue that Earles used an improper methodology in her analysis; notably, he does not challenge the reliability of Earles's conclusion as to the presence of fentanyl.

Brown represents that Earles's testimony would be based on "scientifically unsound methods." But, as the Government points out, he provides no facts, arguments, or case law supporting that assertion. However,"it is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson*, 243 F.3d at 251. The Government, as the proponent of Earles's testimony, has not offered any explanation on how Earles performed her test or about the reliability of her methods, other than to note that forensic scientists are frequently qualified as experts. Thus, the Government still needs to establish the reliability of Earles's methods.

Although the Court recognizes that the Government has not yet laid a proper foundation for Earles to offer expert testimony, the Court exercises its discretion and declines to hold a formal *Daubert* hearing. *See Clay*, 215 F.3d at 667. "To the extent [Brown has] specific, articulable objections to the admissibility of [Earles's] opinions, [he] should raise them during trial, after the

Government has laid a foundation for the testimony." *United States v. Stone*, 2012 WL 175161 at *2 (E.D. Mich. 2012). At that time, Brown may question Earles, and the Court may decide to exclude testimony based on this testimony. *See Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed.Appx. 479, 484 (6th Cir. 2002) ("The judge must simply keep watch over the proceedings, and, with the aid of objections from council (sic), eliminate methodologically unsound or irrelevant expert testimony").

**B. Conclusion**

The Court will deny this motion to the extent it seeks a formal *Daubert* hearing. Because the Government has not yet attempted to lay a proper foundation for Earles's testimony, the Court will not rule on the admissibility of Earles's expert testimony. After the Government lays its foundation, Brown may re-raise his challenge.

## III. ECF No. 82: Motion for *Daubert* Hearing and to Preclude Testimony of Government's Proposed Expert Cellular Analysis

In this motion, Brown asks the Court to exclude the Government's expert testimony on cell-site analysis or to hold a *Daubert* hearing on that issue.

For the standards that govern this motion, see Section II.A, above.

Here, Brown challenges the qualifications of the Government's expert, the reliability of cell-site analysis, and the relevance of cell-site analysis.

**A. Qualifications of Proposed Expert**

At the hearing on this motion, the Government stated that its expert at trial would be FBI Special Agent George Rienerth. The Government represents that Agent Rienerth has been with the FBI for five years, has completed over three hundred hours of specialized training in cellular analysis, and holds multiple advanced degrees and certifications. The Court finds that, if the

Government lays a foundation consistent with its representations, Agent Rienerth would be qualified to testify as an expert on historical cell-site analysis.

**B. Relevancy**

The cell-site analysis would be relevant because it would help the jury "determine a fact in issue" (i.e. whether Brown's cell phone was in the general vicinity of A.B. when the alleged drug transactions occurred).

**C. Reliability**

The Sixth Circuit has recognized that cell-site analysis is "established as reliable" when offered to show that a phone was in general area. *See United States v. Pembrook*, 876 F.3d 812, 824 (6th Cir. 2017), *vacated on other grounds, Calhoun v. United States*, 139 S.Ct. 137 (Mem.) (2018)

Moreover, in *United States v. Hill*, 818 F.3d 289 (7th Cir. 2016), the Seventh Circuit discussed the reliability of historical cell-site analysis at length. The court began by describing how historical cell-site analysis works:

> Historical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time. A cell phone is essentially a two-way radio that uses a cellular network to communicate. Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone*, 18 Rich. J.L. & Tech. 3, 5 (2011). Each cell tower covers a certain geographic area. That geographic area depends upon "the number of antennas operating on the cell site, the height of the antennas, topography of the surrounding land, and obstructions (both natural and manmade)." *Id.* In urban areas, cell towers may be located every one-half to one mile, while cell sites in rural areas may be three to five miles apart. *Id*. When a cell phone user makes a call, the phone generally "connect[s] to the cell site with the strongest signal," although "adjoining cell [towers] provide some overlap in coverage." *Id*. While the proximity of the user is a significant factor in determining the cell tower with which the cell phone connects, it is not the only one. *Id*. Other factors include the towers' technical aspects, including geography and topography, the angle, number, and directions of the antennas on the sites, the technical characteristics of the relevant phone, and "environmental and geographical factors." *Id*. at 7.

*Id*. at 295-96.

After laying out the applicable standards, the Seventh Circuit then noted that "[d]istrict courts that have been called upon to decide whether to admit historical cell-site analysis have almost universally done so." *Id*. at 297. But, the court also noted that "judicial acceptance is not relevant; what matters is the general acceptance in the relevant expert (scientific or otherwise) community." *Id*.

Even though judicial acceptance, alone, does not pass muster, the *Hill* court concluded that"[t]he advantages, drawbacks, drawbacks, confounds, and limitations of historical cell-site analysis are well known by experts in the law enforcement and academic communities." *Id*. at 298 (referencing Matthew Tart *et al.*, *Historical Cell Site Analysis—Overview of Principles and Survey Methodologies*, 8 DIGITAL INVESTIGATION 185–86 (2012); Blank, 18 RICH. J.L. & TECH. at 3–5; and Herbert B. Dixon Jr., *Scientific Fact or Junk Science? Tracking A Cell Phone Without GPS*, 53 JUDGES' J. 37 (2014)). "The science and methods upon which the technique is based are understood and well-documented." *Id*. at 299.

However, the *Hill* court did not give the Government a blank check when it comes to the admission of historical cell-site analysis. In *Hill*, the trial expert "emphasized that [the defendant's] cell phone's use of a cell site did not mean that [defendant] was right at that tower or at any particular spot near that tower." *Id*. at 298. "This disclaimer save[d] his testimony" because historical cell-site analysis can only "show with sufficient reliability that a phone was in a *general area*, especially in a well-populated area." *Id*. (emphasis added). Although the expert's testimony was relevant, probative, and allowed the jury to reasonably infer that the defendant was in a five-mile radius of the cell tower, this testimony was not "*that* helpful." *Id*. at 299 (emphasis in original).

Because the *Hill* court was concerned that a jury might overestimate the quality of the information provided by historical cell-site analysis, it cautioned the Government not to oversell the analysis's precision. *Id*. ("We therefore caution the government not to present historical cell-site evidence without clearly indicating the level of precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time."). And it warned that "[t]he admission of historical cell-site evidence that overpromises on the technique's precision—or fails to account adequately for its potential flaws—may well be an abuse of discretion." *Id*.

Applying the detailed analysis in *Hill* to the current case, the Court concludes that, although "[t]he science and methods upon which [historical cell-site analysis] is based are understood and well-documented," they are only reliable to show that a cell phone was in a general area. *Id*. at 299. The Government acknowledges this relative imprecision in its response to Brown's motion. Gov't Res. 11-12 (ECF No. 94, PageID 778-79). Thus, assuming that the Government lays a proper foundation and accurately represents historical cell-site analysis's limits at trial, its expert testimony is reliable. Accordingly, the Court finds that a *Daubert* hearing is unneccesary. *See Clay*, 215 F.3d at 667; *see also Avery Dennison Corp.* 45 Fed.Appx. at 484 ("The judge must simply keep watch over the proceedings, and, with the aid of objections from council (sic), eliminate methodologically unsound or irrelevant expert testimony.")

**D. Conclusion**

The Court will deny this motion to the extent it seeks a formal *Daubert* hearing. Because the Government must still lay a proper foundation for the expert testimony at trial, the Court will not rule on its admissibility. After the Government lays its foundation, Brown may re-raise his challenge.

## IV. ECF No. 103: Motion to Exclude Evidence from October 5, 2016 Drug Sale

In this motion, Brown seeks to exclude evidence from a October 5, 2016 drug sale made by his co-conspirator Sharp. The Government charged only Sharp with distribution and possession with intent to distribute a controlled substance for the October 5, 2016 drug sale (Count II). Brown argues that evidence of this sale should be excluded because he is not charged in Count II and "there is no evidence linking Brown to this incident."

Brown's argument ignores that he and Sharp are charged as conspirators, and, in Count I, the Government alleges that their conspiracy lasted from October 2016 until December 2017. The Government argues that the October 5, 2016 drug sale was made in furtherance of the conspiracy charged in Count I, and that Brown will be connected to this sale through evidence presented at trial and a *Pinkerton* theory. The Court agrees with the Government. Because evidence related to the October 5, 2016 drug sale is not clearly inadmissible on all potential grounds, the Court will deny this motion.

## THE GOVERNMENT'S MOTIONS

## I. ECF No. 84: Motion Concerning the Admissibility of Photographs

In this motion, the Government seeks a ruling from the Court that photographs taken at the scene of A.B.'s death are admissible. Specifically, the Government would like to introduce photos of A.B.'s lifeless body, which include a "foam froth" emanating from his mouth. In response, Brown argues that the photographs are not relevant and, even if they are, the photos are unfairly prejudicial. *See* Fed. R. Evid. 401 and 403.

At the hearing on these motions, the Government offered the five photographs into evidence.[2] Brown's counsel stated that he did not object to the admission of Exhibit 1 or Exhibit 2.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Generally, relevant evidence is admissible. *See* Fed. R. Evid. 402. However, the Court "may exclude relevant evidence if it its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue dely, wasting time, or needlessly persenting cumulative evidence." Fed. R. Evid. 403.

**A. Relevancy**

Here, the Government argues that the challenged pictures of A.B.'s body are relevant because its expert, Dr. Ljubisa Dragovic, will testify that the froth emanating from A.B.'s mouth "demonstrates edema in the lungs, a symptom of fentanyl usage." Gov't Mot. 2 (ECF No. 84, PageID 695). Thus, the Government represents that the froth is probative of the "critical fact" that A.B.'s death was caused by fentanyl ingestion. Brown disagrees, arguing that this link between froth and fentanyl is "not supported by any medical evidence" and that "foaming or frothing can be caused by a number of factors related to and not related to a drug overdose." Def.'s Res. 3. (ECF No. 95, PageID 752).

---

[2]The Government's exhibits include brief, descriptive "attachment file" names. At the hearing, the Government represented that these names would not be on the pictures if introduced at trial. However, to ensure that the Court and the parties are referring to the same photo, the Court identifies which exhibit corresponds with which attachment file name:

Exhibit 1: "Body Placement"
Exhibit 2: "Dinner Table / Body"
Exhibit 3: "Body Placement 2"
Exhibit 4: "Head"
Exhibit 11: "Backside of Body"

The Government has the better of this argument. Assuming that a proper foundation is laid to conclude that there is a link between fentanyl ingestion and frothing at the mouth, the photos would tend to make it more probable that A.B. ingested fentanyl before his death. That fact is of consequence in this action. Thus, assuming the proper foundation, the photos are relevant.

However, the Government has not yet laid a foundation for the Court to conclude that there is a link between fentanyl use and frothing at the mouth. Accordingly the Court will deny this motion without prejudice. At trial, Brown may again challenge the admission of these photos if he is not satisfied that the Government has laid a proper foundation. He may also re-raise his argument that the challenged photographs are unfairly prejudicial.

### C. Conclusion

For these reasons, the Court will deny this motion without prejudice to the extent that it declines to rule on the admissibility of Exhibit 3, 4, and 11 until the Government lays a proper foundation at trial.

## II. ECF No. 85: Motion Concerning Out-of-Court Statements

In this motion, the Government seeks a ruling from the Court that six statements made by A.B. before his death are admissible under an exception to the hearsay prohibition. Here are the statements:

**Statement One**: On October 15, 2017, A.B. sent a text to a confidential witness ("CW") saying "Try to line something up for tomorrow."

**Statement Two**: On October 16, 2017, A.B. sent a text to CW, saying "I got 40 to spend if we can get A1, 60 if we got to go through Harvey or Brandon."

**Statement Three**: After A.B. and CW used cocaine, A.B. wanted to use heroin. A.B.

suggested that they call Brown.

**Statement Four**: A.B. left CW's house, after stating that he was going to take his chances with Brown and was going to see him to obtain heroin.

**Statement Five**: When A.B. returned to CW's house, he told the confidential witness that he had obtained heroin from "Stoney" at Brown's house and in Brown's presence.

**Statement Six**: A.B. left CW's house again. CW texted A.B., commenting on the potency of the heroin and imploring him "Don't do no more, dude." CW then called A.B. who said that he had used more the heroin, the same amount that he and CW had done together earlier in the evening.

"Hearsay" is an assertion "that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(a)-(c). Generally, hearsay is not admissible, unless an exception applies. Fed. R. Evid. 802 and 803. The Government argues that Statements One, Two, Three, Four, and Six fall within Fed. R. Evid. 803(3)'s exception for statements regarding the declarant's then-existing mental, emotional, or physical condition. The Government also argues that Statement Five is admissible under Fed. R. Evid. 807's residual exception.

**A. Rule 803(3) Statements**

Rule 803(3) states, in part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> . . .
>
> (3) **Then-Existing Mental, Emotional, or Physical Condition**. A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) but not includin a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Here, Statements One, Two, Three, and Four qualify for this exception because they show an intent or plan to buy drugs. In Statement One, A.B. asked CW to "try to line something up for tomorrow." In Statement Two, A.B. texted, "I got 40 to spend if we can get A1, 60 if we got to go through Harvey or Brandon." In Statement Three, A.B. suggested that they call Brown for drugs and, in Statement Four, A.B. informed CW that he intended to buy drugs from Brown. Thus, these statements show A.B.'s then-existing state of mind as to his intent and plan to buy drugs. Statements One, Two, Three, and Four are admissible under Rule 803(3).

Statement Six, however, is not. In Statement Six, A.B. told CW that he had used heroin again, in the same dose that he had previously used with CW. The Government argues that this statement goes to A.B.'s physical condition, such as mental feeling, pain, or bodily health. But A.B. did not say "I feel sick" or "I feel the effects of heroin." Rather, he appears to have said something along the lines of "I ingested heroin again, in the same amount that we did before." This kind of statement is neither a statement of A.B.'s then-existing state of mind nor a statement about his emotional, sensory, or physical condition. It is simply an assertion of a past act (i.e. that he ingested heroin). Thus, Statement Six does not fall within Rule 803(3).

**B. Rule 807 Statements**

The Government argues that Statements Five and Six are admissible under Rule 807's residual exception. Rule 807 allows the admission of hearsay if four conditions are met. First, the statement must have "equivalent circumstantial guarantees of trustworthiness" to the enumerated exceptions in Rules 803 and 804. Rule 807(a)(1). Second, the statement must be "offered as evidence of a material fact." Rule 807(a)(2). Third, the statement must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through

reasonable efforts." Rule 807(a)(3). And, fourth, "admitting [the statement] will best serve the purposes of these rules and the interests of justice." Rule 807(a)(4).

Here, Statements and Five and Six appear to be exactly the type of statements that the rule against hearsay guards against. In Statement Five, A.B. told CW that he had bought drugs from Brown's co-conspirator at Brown's house and in Brown's presence. In Statement Six, A.B. confirmed that he had ingested a large quantity of the heroin he purchased from Brown's co-conspirator. Both of these statements are assertions about past acts, and there is no indication that they have circumstantial guarantees equivalent to those supporting the enumerated hearsay exceptions.

The trustworthiness of these statements is further damaged by their source. The Government seeks to introduce this statement through CW, a co-conspirator, who has pleaded guilty and is awaiting sentencing. CW may have a "strong motivation to implicate [Brown] and to exonerate himself," so his statements about Brown's involvement—and what A.B. told him about Brown's involvement—should be viewed with "special suspicion." *See United States v. Gomez-Lemos*, 939 F.2d 326, 330 (6th Cir. 1991); *see also United States v. Barlow*, 693 F.2d 954, 962 (6th Cir. 1982) (when determining whether testimony possesses circumstantial guarantees of trustworthiness, a trial court should consider the declarant's relationship with both the defendant and the government).

Thus, the Court declines to rule that Statements Five or Six are admissible.

**C. Conclusion**

For these reasons the Court grants the Government's motion to the extent it rules that, if a proper foundation is laid, Statements One, Two, Three, and Four are admissible, and denies the Government's motion to the extent it declines to rule that Statements Five and Six are admissible.

Of course, depending on how this testimony is actually presented at trial, the Court may alter this ruling. *See Luce*, 469 U.S. at 42-43.

**CONCLUSION**

For the reasons above, the Court disposes of the motions *in limine* as follows:

<u>Defendant Brown's Motions</u>

- ECF No. 80 (Robinson's PSR and Plea Transcript): **DENIED** as to Robinson's PSR and **GRANTED** as to the plea transcript. The Clerk of the Court is **ORDERED** to provide Brown's counsel with a copy of the transcript from Robinson's plea hearing.
- ECF No. 81 (Challenge to Lab Report): **DENIED WITHOUT PREJUDICE**
- ECF No. 82 (Challenge to Cell-site Analysis): **DENIED WITHOUT PREJUDICE**
- ECF No. 103 (Evidence of Sharp's October 2016 drug deal): **DENIED**

<u>The Government's Motions</u>

- ECF No. 84 (Photographs of A.B.): **DENIED WITHOUT PREJUDICE**
- ECF No. 85 (A.B's out-of-court statements): **GRANTED** as to Statements One, Two, Three, and Four and **DENIED** as to Statements Five and Six

Again, trials are dynamic and "even if nothing unexpected happens," the Court "is free, in the exercise of sound judicial discretion, to alter" any of the above rulings. *Luce*, 469 U.S. at 41-42.

**IT IS SO ORDERED.**

August 5, 2019

s/Sean F. Cox
Sean F. Cox
United States District Judge